# IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2013 Term

FILED

February 5, 2013

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 12-0850

DELORICE BRAGG, as Administratrix of the
Estate of DON ISRAEL BRAGG and
FREDA HATFIELD, as Administratrix of the
Estate of ELLERY HATFIELD,
Plaintiffs Below, Petitioners

V.

UNITED STATES OF AMERICA,
Defendant Below, Respondent

Certified Question from The United States Court
of Appeals for the Fourth Circuit
Case No. 11-1342

CERTIFIED QUESTION ANSWERED

Submitted: October 17, 2012
Filed:  February 5, 2013

Bruce E. Stanley
Reed Smith LLP
Pittsburgh, Pennsylvania
Attorney for the Petitioners

R. Booth Goodwin, II
United States Attorney
Fred B. Westfall, Jr.
Assistant United States Attorney
Charleston, West Virginia
Benjamin S. Kingsley
U.S. Department of Justice
Washington, District of Columbia
Attorneys for the Respondent

**JUSTICE DAVIS delivered the Opinion of the Court.**

**JUSTICE BENJAMIN, deeming himself disqualified, did not participate.**

**JUDGE PAUL T. FARRELL, sitting by temporary assignment.**

**SYLLABUS BY THE COURT**

1.      "This Court undertakes plenary review of legal issues presented by certified question from a federal district or appellate court."  Syllabus point 1, *Bower v. Westinghouse Electric Corp.*, 206 W. Va. 133, 522 S.E.2d 424 (1999).

2.      "In the matters of negligence, liability attaches to a wrongdoer, not because of a breach of a contractual relationship, but because of a breach of duty which results in an injury to others."  Syllabus point 2, *Sewell v. Gregory*, 179 W. Va. 585, 371 S.E.2d 82 (1988).

3.      "The ultimate test of the existence of a duty to use care is found in the foreseeability that harm may result if it is not exercised.  The test is, would the ordinary man in the defendant's position, knowing what he knew or should have known, anticipate that harm of the general nature of that suffered was likely to result?"  Syllabus point 3, *Sewell v. Gregory*, 179 W. Va. 585, 371 S.E.2d 82 (1988).

4.      A private inspector who inspects a work premises for the purpose of furthering the safety of employees who work on said premises owes a duty of care to those employees to conduct inspections with ordinary skill, care, and diligence commensurate with that rendered by members of his or her profession.

i

**Davis, Justice:**

In this action presenting a certified question from the United States Court of Appeals for the Fourth Circuit, this Court is asked "whether a private party conducting inspections of a mine and mine operator for compliance with mine safety regulations is liable for the wrongful death of a miner resulting from the private party's negligent inspection?" After considering the parties' arguments and the relevant law, we answer this certified question affirmatively.

## I.

### FACTUAL AND PROCEDURAL HISTORY

The event giving rise to the lawsuit underlying this certified question action occurred on January 19, 2006, when an over-accumulation of combustible coal dust caused a deadly fire in the Aracoma Coal Company's Alma Mine #1 in Logan County, West Virginia. Twelve miners were trapped inside the mine by smoke and fire. Attempts to extinguish the fire and contain smoke resulting therefrom were inhibited by numerous inadequate safety measures. According to the Order of Certification issued in this matter by the Fourth Circuit Court of Appeals, the inadequate safety measures included:

> a fire hose rendered useless because "the threads on the fire hose coupling did not match the threads on the outlet"; a lack of water because "the main water valve had been closed at the source, cutting off water to the area where the fire had started"; inadequate ventilation controls and ventilation safety barriers that failed to warn the miners of the danger and allowed smoke to flow "in the wrong direction, deeper into the

1

mine . . . flooding the emergency escapeways"; and the absence of functioning CO [carbon monoxide] detectors, as well as malfunctioning communications equipment, that delayed warning the miners of the danger and delayed evacuation.

The Fourth Circuit further noted that a personnel door was unmarked, and breathing devices known as Self-Contained Self-Rescuers were rendered useless to miners trapped by the smoke because the miners had not been trained to operate the devices. Ultimately, ten of the trapped miners managed to escape the mine, but Don Israel Bragg and Ellery Hatfield succumbed to carbon monoxide intoxication and died as a result thereof.

It was determined from a subsequent investigation by the Mine Safety & Health Administration (hereinafter "MSHA") that numerous violations of the Mine Safety and Health Act (hereinafter "Mine Act")[1] by mine owner Aracoma Coal Company contributed to the cause and severity of the fire. In addition, however, MSHA's investigation uncovered numerous inadequacies in its own inspections of Alma Mine #1. The "Order of Certification" issued by the Fourth Circuit in this case summarized MSHA's conclusions as follows:

> MSHA's investigation of the Mine fire revealed numerous violations of the Mine Safety and Health Act ("Mine Act"), 30 U.S.C. § 801, *et. seq.*, by Aracoma Coal Company ("Aracoma Coal") that contributed to the cause and severity of the fatal fire. MSHA's investigation also revealed the inadequacies of its own previous inspections of the Mine. For

---

[1]The Mine Safety and Health Act is codified at 30 U.S.C. § 801 *et seq.*

2

example, by late 2005, MSHA inspectors issued 95 citations to Aracoma Coal for safety violations but failed to "identify and cite numerous violations that were in existence, neither did they require the mine operator to take corrective actions." . . . Likewise, MSHA personnel "failed to follow explicit Agency policy regarding Section 103(i) inspections [i.e., spot inspections]" by failing to "undertake reasonable efforts to detect mine hazards", through a "gross misallocation of inspector resources," and by exhibiting "a lack of initiative to appropriately conduct Section 103(i) inspections." . . .

Accordingly, MSHA determined that its own inspectors were at fault for failing to identify or rectify many obvious safety violations that contributed to the fire. In relation to training, MSHA concluded that its inspector "assigned to inspect the [Mine] did not determine whether the [atmospheric monitoring system] operator[, who ignored the CO [carbon monoxide] alarms during the fire,] was adequately familiar with his duties and responsibilities, even though this determination was required of and understood by the inspector." . . . The MSHA investigation also revealed that "[a]n adequate inspection by MSHA [of the atmospheric monitoring system ("AMS")] would have identified the deficiencies with the AMS, including the fact that no alarm unit had been installed." . . . In relation to the ventilation controls, the MSHA investigation confirmed that its inspectors, "demonstrated a lack of initiative to identify basic violations . . . even though the unmarked doors and missing stoppings were obvious and easily identifiable . . . [such that] an adequate MSHA investigation . . . would have identified the missing stoppings." . . . The MSHA investigation also revealed . . . other contributing factors to the fire including its "inadequate" inspection of the conveyor belts and its "ineffective use of MSHA's enforcement authority" in issuing citations for accumulated coal dust. . . .

MSHA's internal report speculated that conflicts of interest may have contributed to its inspectors' inadequate and ineffective inspection and enforcement of the Mine's compliance with mine safety regulations:

The internal review team has concluded that mine inspectors neglected to issue citations in some situations in which citations were justified and that mine inspectors on occasion underestimated [Aracoma Coal's] negligence and/or the gravity of the hazardous conditions when violations were cited. . . . The failure to propose more significant civil penalties likely interfered with the deterrent value that civil penalties are designed to have under the Mine *Act. . . .* [(]*The internal review team believes that some of the identified deficiencies may have stemmed from the relationship that MSHA developed with Massey Energy Company representatives in early 2001. . . . [U]sing enforcement personnel in this manner to assist the Aracoma Coal Company with its compliance efforts may have created a conflict of interest that, over time, may have affected the level of scrutiny MSHA provided at [the Mine] during subsequent mine inspections*[).]

. . . .

In light of its extensive findings of inadequacy and ineffectiveness in its inspections, supervision and enforcement at the Mine, MSHA's internal investigation concluded as follows:

It is the internal review team's conclusion that, in the year before the January 19, 2006, fatal fire at the [Mine], MSHA did not conduct inspections in a manner that permitted us to effectively identify hazardous conditions at the mine, and did not utilize the Mine Act to effectively enforce health and safety standards promulgated to provide miners with the protections afforded by the statute. The Aracoma Coal Company's indifference to health and safety conditions at the [Mine] and MSHA's failure to more effectively enforce the Mine Act allowed significant hazards, many of which otherwise might have been

4

identified and addressed, to continue in existence prior to the fatal fire. The Agency's culpability rests with all persons who directly or indirectly were responsible for administering the Mine Act at the [Mine], from the inspectors who conducted the mine inspections through the headquarters office personnel who ultimately were responsible for overseeing MSHA activities throughout the Nation.

(Internal citations to joint appendix filed in the Fourth Circuit omitted).

The United States notes that, following the fire, Aracoma Coal and several Aracoma supervisors at the mine plead guilty to federal charges of criminal negligence. The company also settled separate tort claims brought against it by the same plaintiffs in this suit.

The petitioners, Delorice Bragg (hereinafter "Mrs. Bragg") and Freda Hatfield (hereinafter "Mrs. Hatfield"), who are the widows of Don Israel Bragg and Ellery Hatfield, filed the underlying lawsuit against the United States. The suit was filed in the United States District Court for the Southern District of West Virginia pursuant to the Federal Tort Claims Act ("FTCA"). Under the FTCA, the United States' sovereign immunity is waived for torts committed by federal employees acting within the scope of their employment "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1) (1996) (2006 ed.).

The United States moved to dismiss the complaint under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction, arguing that a private party inspecting mines in "like circumstances" to those alleged in the complaint would not be held liable under West Virginia law. According to the Fourth Circuit, the District Court agreed and dismissed the complaint on the grounds that

> West Virginia law would not hold a private analogue to the MSHA inspectors liable for negligence resulting in the wrongful death of the miners. In doing so, the district court rejected theories of liability based upon: (1) West Virginia's general negligence principles as identified in *Aikens v. Debow*, 208 W. Va. 486, 541 S.E.2d 576 (2000), because "[i]rrespective of the foreseeability of risk" to the miners that may flow from the MSHA's negligent inspection, . . . "overriding public policy concerns caution against imposing a legal duty upon the MSHA inspectors," . . . and (2) West Virginia's "special relationship" theory identified in *Aikens* because "based upon the relevant West Virginia case law, it does not appear that a private analogue to the MSHA inspectors would be held liable to the decedent miners under a special relationship theory." . . .

(Internal citations to joint appendix filed in the Fourth Circuit omitted).

Mrs. Bragg and Mrs. Hatfield appealed to the United States Court of Appeals for the Fourth Circuit. Finding no clear controlling West Virginia precedent to guide its decision, the Fourth Circuit certified to this Court the following question:

> Whether a private party conducting inspections of a mine and mine operator for compliance with mine safety regulations is liable for the wrongful death of a miner resulting from the private party's negligent inspection?

6

This Court accepted the certified question by order entered July 19, 2012.

## II.

## STANDARD OF REVIEW

The instant matter is before this Court on certified question from the United States Court of Appeals for the Fourth Circuit. "This Court undertakes plenary review of legal issues presented by certified question from a federal district or appellate court." Syl. pt. 1, *Bower v. Westinghouse Elec. Corp.*, 206 W. Va. 133, 522 S.E.2d 424 (1999). *Accord* Syl. pt. 1, *Light v. Allstate Ins. Co.*, 203 W. Va. 27, 506 S.E.2d 64 (1998) ("A *de novo* standard is applied by this Court in addressing the legal issues presented by a certified question from a federal district or appellate court."). Accordingly, we will fully consider the question herein certified.

## III.

## DISCUSSION

The question certified to this Court seeks to aid the Fourth Circuit in determining whether the United States' sovereign immunity is waived with respect to the claims asserted by Mrs. Bragg and Mrs. Hatfield. As noted above, the instant matter was brought pursuant to the FTCA, under which the United States' sovereign immunity is waived for torts committed by federal employees acting within the scope of their employment "under circumstances where the United States, if a private person, would be liable to the claimant

7

in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). Thus, under the FTCA, "[t]he United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances[.]" 28 U.S.C. § 2674 (1988) (2006 ed.). *See Kerns v. United States*, 585 F.3d 187, 194 (4th Cir. 2009) (commenting that "[a]n action under the FTCA may only be maintained if the Government would be liable as an individual under the law of the state where the negligent act occurred," and citing 28 U.S.C. § 1346(b)(1)).

The United States Supreme Court addressed the language of 28 U.S.C.A. § 2674 in *Indian Towing Co. v. United States*, 350 U.S. 61, 76 S. Ct. 122, 100 L. Ed. 48 (1955). The *Indian Towing* plaintiffs alleged that the U.S. Coast Guard had negligently operated a lighthouse, which negligence led to a tug boat going aground and damaging the cargo on a barge being towed by the tug. A lawsuit under the FTCA was brought, and the United States argued that the imposition of liability "'in the same manner and to the same extent as a private individual under like circumstances . . .' must be read as excluding liability in the performance of activities which private persons do not perform. Thus, there would be no liability for negligent performance of 'uniquely governmental functions.'" *Indian Towing*, 350 U.S. at 64, 76 S. Ct. at 124, 100 L. Ed. 48. In a five to four decision, the Supreme Court rejected this argument and observed that "all Government activity is inescapably 'uniquely governmental' in that it is performed by the Government." *Id.* at 67,

8

76 S. Ct. at 126, 100 L. Ed. 48. Recognizing its competing duties when interpreting a statute such as the FTCA, the Supreme Court commented further that: "Of course, when dealing with a statute subjecting the Government to liability for potentially great sums of money, this Court must not promote profligacy by careless construction. Neither should it as a self-constituted guardian of the Treasury import immunity back into a statute designed to limit it." *Id.* at 69, 76 S. Ct. at 126, 100 L. Ed. 48. Finally, the Supreme Court concluded:

> The Coast Guard need not undertake the lighthouse service. But once it exercised its discretion to operate a light on Chandeleur Island and engendered reliance on the guidance afforded by the light, it was obligated to use due care to make certain that the light was kept in good working order; and, if the light did become extinguished, then the Coast Guard was further obligated to use due care to discover this fact and to repair the light or give warning that it was not functioning. If the Coast Guard failed in its duty and damage was thereby caused to petitioners, the United States is liable under the Tort Claims Act.

*Id.* at 69, 76 S. Ct. at 126-27, 100 L. Ed. 48.

More recently, the United States Supreme Court analyzed the proper analysis to be applied in determining, for purposes of the FTCA, whether there exists under state law a private analogy to the factual circumstances presented in a given action in the case of *United States v. Olson*, 546 U.S. 43, 126 S. Ct. 510, 163 L. Ed. 2d 306 (2005). The unanimous *Olson* Court explained that "the words '"like circumstances"' *do not* restrict a court's inquiry to the *same circumstances*, but require it to look further afield." 546 U.S. at 46, 126 S. Ct. at 511, 163 L. Ed. 2d 306 (first emphasis added) (quoting *Indian Towing*, 350

U.S. at 64, 76 S. Ct. at 124, 100 L. Ed. 48).

The facts presented in *Olson* were somewhat similar to those of the instant case: An injured miner sued MSHA under the FTCA alleging that negligence of federal mine inspectors helped bring about a serious accident at an Arizona mine.[2] The district court granted MSHA's motion to dismiss. On appeal, the Ninth Circuit Court of Appeals concluded there was no *private* analogue for imposing liability on mine inspectors. The circuit court then analogized Arizona law that held *state government* mine inspectors liable for failure to conduct mandatory inspections to find that federal immunity was waived under the FTCA. The United States Supreme Court reversed based upon its conclusion that

> [t]he Federal Tort Claims Act (FTCA or Act) authorizes private tort actions against the United States "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). We here interpret these words to mean what they say, namely, that the United States waives sovereign immunity "under circumstances" where local law would make a "*private person*" liable in tort. (Emphasis added.) And we reverse a line of Ninth Circuit precedent permitting courts in certain circumstances to base a waiver simply upon a finding that local law would make a "state or municipal entit[y]" liable.

546 U.S. at 44, 126 S. Ct. at 511-12, 163 L. Ed. 2d 306. Thus, the Supreme Court has made clear that a state law analogy of "like circumstances" must consider only causes of action against private, as opposed to government, parties. With respect to the term "like

_____

[2]A nine-ton slab of earth fell from the ceiling of the mine.

10

circumstances," the Supreme Court further explained that

> [t]he Act makes the United States liable "in the same manner and to the same extent as a private individual under *like circumstances*." 28 U.S.C. § 2674 (emphasis added). As this Court said in *Indian Towing*, the words "'like circumstances'" do not restrict a court's inquiry to the same circumstances, but require it to look further afield. 350 U.S., at 64[, 76 S. Ct. at 122]; see also S. Rep. No. 1400, 79th Cong., 2d Sess., 32 (1946) (purpose of FTCA was to make the tort liability of the United States "the same as that of a private person under like circumstance, in accordance with the local law"). . . .
>
> The Government in effect concedes that similar "good Samaritan" analogies exist for the conduct at issue here. It says that "there are private persons in 'like circumstances'" to federal mine inspectors, namely, "private persons who conduct safety inspections." Reply Brief for United States 3. And other Courts of Appeals have found ready private person analogies for Government tasks of this kind in FTCA cases. *E.g.*, *Dorking Genetics v. United States*, 76 F.3d 1261 (C.A.2 1996) (inspection of cattle); *Florida Auto Auction of Orlando, Inc. v. United States*, 74 F.3d 498 (C.A.4 1996) (inspection of automobile titles); *Ayala v. United States*, 49 F.3d 607 (C.A.10 1995) (mine inspections); *Myers v. United States*, 17 F.3d 890 (C.A.6 1994) (same); *Howell v. United States*, 932 F.2d 915 (C.A.11 1991) (inspection of airplanes). These cases all properly apply the logic of *Indian Towing*. Private individuals, who do not operate lighthouses, nonetheless may create a relationship with third parties that is similar to the relationship between a lighthouse operator and a ship dependent on the lighthouse's beacon. *Indian Towing*, *supra,* at 64-65, 69[, 76 S. Ct. 122]. The Ninth Circuit should have looked for a similar analogy in this case.

*Olson*, 546 U.S. at 46-47, 126 S. Ct. at 513, 163 L. Ed. 2d 306. Thus, it is not necessary for

state tort law to provide a duplicate of the circumstances presented in a given case; it is

sufficient if there is a "*similar* analogy." *Olson*, 546 U.S. at 47, 126 S. Ct. at 513, 163

11

L. Ed. 2d 306 (emphasis added). *See also Carter v. United States*, 982 F.2d 1141, 1144 (7th Cir. 1992) ("The national government is never situated identically to private parties. Our task is to find a fitting analog under private law. Thus the United States may be liable for negligence in carrying out acts that no private person performs, because there are 'like' circumstances that lead to private liability." (citation omitted)).

A "similar analogy" to holding an MSHA inspector liable to a third-party mine employee may be found in at least four cases in which this Court has held that a duty may be owed to a third party: *Sewell v. Gregory*, 179 W. Va. 585, 371 S.E.2d 82 (1988); *Louk v. Isuzu Motors, Inc.*, 198 W. Va. 250, 479 S.E.2d 911 (1996); *Eastern Steel Constructors v. Salem*, 209 W. Va. 392, 549 S.E.2d 266 (2001); and *Kizer v. Harper*, 211 W. Va. 47, 561 S.E.2d 368 (2001) (per curiam).

In *Sewell v. Gregory*, 179 W. Va. 585, 371 S.E.2d 82, second purchasers of a home, who *did not* purchase the home from the builder, sued the builder for*, inter alia*, negligently designing and constructing the home insofar as the home was subject to repeated flooding. The circuit court dismissed the counts whereby the second purchasers of the home sued the builder directly. This Court reversed on appeal. With regard to liability based upon negligence, this Court held that "[i]n the matters of negligence, liability attaches to a wrongdoer, not because of a breach of a contractual relationship, but because of a breach of duty which results in an injury to others." Syl. pt. 2, *Sewell*, 179 W. Va. 585, 371 S.E.2d 82.

12

The *Sewell* Court then considered how other courts had addressed negligence suits by

subsequent purchasers against home builders and reasoned that

> [t]he courts which have allowed negligence actions have done so because it is entirely foreseeable that there will be subsequent owners of the houses built.
>
> Liability will be imposed, however, only if it is foreseeable that the contractor's work, if negligently done, may cause damage to the property or injury to persons living on or using the premises.
>
> . . . .
>
> *Coburn*[ *v. Lenox Homes*], 173 Conn. [567,] 575-76, 378 A.2d [599,] 602-03 [(1977)] (citations omitted). The Appellee foresaw that there would be subsequent purchasers when he constructed the house in question. Indeed, he took economic advantage of that eventuality by acting as the real estate agent in the sale to the Appellants.

*Sewell*, 179 W. Va. at 588, 371 S.E.2d at 85. Based upon its analysis of the existence of a

duty to a third party, the *Sewell* Court clarified that

> [t]he ultimate test of the existence of a duty to use care is found in the foreseeability that harm may result if it is not exercised. The test is, would the ordinary man in the defendant's position, knowing what he knew or should have known, anticipate that harm of the general nature of that suffered was likely to result?

Syl. pt. 3, *Sewell*, *id.* The Court then applied the foregoing principle to hold that

> [a] builder is under a common law duty to exercise reasonable care and skill in the construction of a building and a subsequent homeowner can maintain an action against a builder for negligence resulting in latent defects which the subsequent purchaser was unable to discover prior to purchase.

13

Syl. pt. 4, *id.*

A second example of this Court finding that a duty may be owed to a third party is found in the case of *Louk v. Isuzu Motors, Inc.*, 198 W. Va. 250, 479 S.E.2d 911. The facts of *Louk* involved a fatal automobile accident that occurred when the decedent, Mrs. Louk, was exiting a Wal-Mart store parking lot via an access road to an abutting state highway. The access had been designed and constructed for Wal-Mart by Gray Engineering Consultants, Inc. (hereafter "Gray"). Mrs. Louk's estate subsequently filed suit against numerous parties including Gray. The estate alleged that Gray had negligently planned and designed the access. Gray asserted, *inter alia*, that it owed no duty to Mrs. Louk and that nothing it did or failed to do caused Mrs. Louk's collision. The circuit court granted a directed verdict in favor of Gray. On appeal, this Court adopted

> the principle of *Sewell*, that "[t]he ultimate test of the existence of a duty to use care is found in the foreseeability that harm may result if it is not exercised." *Sewell*, 179 W. Va. at 588, 371 S.E.2d at 85, *quoting Coburn v. Lenox Homes*, 173 Conn. 567, 575, 378 A.2d 599, 603 (1977). We believe that principle to be properly applicable to the matter before us. Certainly, one who designs an access road to lead from a business location to a major highway and proposes to encroach on the public way by means of that access must foresee that the invitees of that business will use the access and depend upon its design.

*Louk*, 198 W. Va. at 260, 479 S.E.2d at 921. Accordingly, the *Louk* Court reversed the directed verdict and held that

> [a]n independent contractor, who claims special skill or knowledge to plan and design an access road and encroachment

14

> onto a public highway, and negligently prepares such a plan and design, may be liable to persons injured as a proximate result of such negligence before or after the plan or design has been accepted by the owner or employer of the independent contractor and regardless of privity.

Syl. pt. 5, *Louk*, 198 W. Va. 250, 479 S.E.2d 911.

The third case in which this Court has found the existence of a duty owed to a third party is *Eastern Steel Constructors v. Salem*, 209 W. Va. 392, 549 S.E.2d 266. Eastern Steel Constructors (hereafter "Eastern") was a contractor that had been hired by the City of Salem (hereafter "Salem") to construct a sewer line to a new sewer treatment plant. During construction, Eastern encountered subsurface rock and existing utility service lines that had not been disclosed in plans and specifications prepared by Kanakanui Associates (hereafter "Kanakanui"), the design professional hired by Salem for the sewer project. The undocumented subsurface conditions caused significant delays and, according to Eastern, caused it to incur substantial economic damages. Notwithstanding the fact that Eastern's agreement with Salem specified that Eastern was "'responsible for the installation of the facilities regardless of the type, nature, or quantity of subsurface conditions, including rock, on the Project,'" it sued the City of Salem and Kanakanui. *Eastern Steel*, 209 W. Va. at 395, 549 S.E.2d at 269. In granting summary judgment to Kanakanui, the circuit court concluded that "there is not a duty owed by the engineer/architect [*i.e.*, design professional] to the building contractor regarding the plans, drawings and specifications, [and for] the adequacy or inadequacy of any or all of them." *Eastern Steel*, *id.*

15

Eastern appealed, and this Court reversed the circuit court's grant of summary judgment with respect to Eastern's claim of professional negligence against Kanakanui.[3] Relying, in part, on this Court's decision in *Sewell*, 179 W. Va. 585, 371 S.E.2d 82, the *Eastern Steel* Court concluded that Eastern could

> properly assert a cause of action for negligence against Kanakanui if it [could] establish[] that Kanakanui owed a duty of care to Eastern. *See also* Syl. pt. 3, *Aikens v. Debow*, 208 W. Va. 486, 541 S.E.2d 576 (2000) (""In order to establish a *prima facie* case of negligence in West Virginia, it must be shown that the defendant has been guilty of some act or omission in violation of a duty owed to the plaintiff. No action for negligence will lie without a duty broken." Syl. Pt. 1, *Parsley v. General Motors Acceptance Corp.*, 167 W. Va. 866, 280 S.E.2d 703 (1981).' Syl. Pt. 4, *Jack v. Fritts*, 193 W. Va. 494, 457 S.E.2d 431 (1995).").

*Eastern Steel*, 209 W. Va. at 396-97, 549 S.E.2d at 270-71. The *Eastern Steel* Court further remarked that,

> [i]n defining the proper considerations for ascertaining the existence of a duty, we observed in [*Aikens v. Debow*, 208 W. Va. 486, 541 S.E.2d 576 (2000),] that, in addition to the primary question of foreseeability of risk in discerning the existence of a duty, consideration must also be given to "'the likelihood of injury, the magnitude of the burden of guarding against it, and the consequences of placing that burden on the defendant.'" *Aikens*, 208 W. Va. at 491, 541 S.E.2d at 581

---

[3]The circuit court's grant of summary judgment also was reversed with respect to Eastern's claim for implied warranty and was affirmed with respect to Eastern's claim that it was a third party beneficiary of the contract between Kanakanui and Salem. These two issues are not relevant to the case at hand.

16

(quoting *Robertson v. LeMaster*, 171 W. Va. 607, 301 S.E.2d 563 (1983)).

*Eastern Steel*, 209 W. Va. at 397, 549 S.E.2d at 271.

Because *Eastern Steel* involved purely economic damages, meaning there was no personal injury or property damage suffered by the plaintiff, the *Eastern Steel* Court went on to analyze the need for a special relationship between the plaintiff and the defendant in addition to analyzing the traditional factors for ascertaining the existence of a duty. This analysis was conducted to overcome the "general rule precluding economic damages in a cause of action . . . where negligence is claimed in the absence of either physical injury, property damage or a contract." *Eastern Steel*, 209 W. Va. at 397, 549 S.E.2d at 271. The facts of the instant case involve physical injury; therefore, no special relationship analysis is required.

The *Eastern Steel* Court ultimately found that the design professional owed a duty of care to the third-party contractor and would be liable for purely economic damages where a special relationship existed. *See* Syl. pt. 6, *Eastern Steel*, 209 W. Va. 392, 549 S.E.2d 266 ("A design professional (e.g. an architect or engineer) owes a duty of care to a contractor, who has been employed by the same project owner as the design professional and who has relied upon the design professional's work product in carrying out his or her obligations to the owner, notwithstanding the absence of privity of contract between the

17

contractor and the design professional, due to the special relationship that exists between the two. Consequently, the contractor may, upon proper proof, recover purely economic damages in an action alleging professional negligence on the part of the design professional."). The *Eastern Steel* Court further held that

> [w]hen a special relationship exists between a design professional and a contractor, the specific parameters of the duty of care owed by the design professional to the contractor must be defined on a case-by-case basis. However, in general, the duty of care owed by a design professional to a contractor with whom he or she has a special relationship is to render his or her professional services with the ordinary skill, care and diligence commensurate with that rendered by members of his or her profession in the same or similar circumstances.

Syl. pt. 7, *Eastern Steel*, 209 W. Va. 392, 549 S.E.2d 266.

The final case we will discuss in which this Court found that a third party could be held liable is *Kizer v. Harper*, 211 W. Va. 47, 561 S.E.2d 368. The plaintiff in *Kizer* was an employee of a cable company who was injured when he fell from a utility pole located on private property. The fall was caused by the negligence of an electrician who had been hired by the property owner's son, Mr. Harper, to upgrade the electrical wiring to her home. Relevant to the instant matter, the cable company employee filed suit against Mr. Harper for the injuries he sustained as a result of the negligence of the electrician. Following a trial, the jury found Mr. Harper was liable. Mr. Harper's post-trial motion for a new trial or judgment as a matter of law was denied by the trial court and he appealed. This Court affirmed in a per curiam opinion, thereby concluding that Mr. Harper had been properly held liable to a

18

third party.

The foregoing cases have found a duty owed to a third party based primarily upon the foreseeability that harm may result if care is not exercised.[4]  Consideration has also

---

[4]Respondent, the United States, directs this Court's attention to the case of *Miller v. Whitworth*, 193 W. Va. 262, 455 S.E.2d 821 (1995), wherein this Court held that,

> [u]nder the common law of torts, a landlord does not have a duty to protect a tenant from the criminal activity of a third party.  However, there are circumstances which may give rise to such a duty, and these circumstances will be determined by this Court on a case-by-case basis.  A landlord's general knowledge of prior unrelated incidents of criminal activity occurring in the area is not alone sufficient to impose a duty on the landlord.  However, a duty will be imposed if a landlord's affirmative actions or omissions have unreasonably created or increased the risk of injury to the tenant from the criminal activity of a third party.

Syl. pt. 6, *id*.  The United States asserts that Mrs. Bragg and Mrs. Hatfield seek to hold mine inspectors liable for the criminal conduct of a third party–the mine operator.  Thus, according to the United States, Mrs. Bragg and Mrs. Hatfield are required to establish that the mine inspectors "unreasonably created or increased the risk of injury" to their decedent husbands.  Syl. pt. 6, in part, *Miller v. Whitworth*, 193 W. Va. 262, 455 S.E.2d 821.  We disagree with this proposition.  The *Miller* Court recognized that "[g]enerally, a person does not have a duty to protect others from the deliberate criminal conduct of third parties. 57A Am. Jur. 2d *Negligence* § 104 (1989).  *See Restatement (Second) of Torts* § 302B cmt. d (1965)." *Miller*, 193 W. Va. at 266, 455 S.E.2d at 825.  In addition, the *Miller* Court explained that "a person usually has no duty to protect others from the criminal activity of a third party because the foreseeability of risk is slight, and because of the social and economic consequences of placing such a duty on a person." *Miller v. Whitworth*, *id*.

We find the circumstances presented in the context of a safety inspector are distinguishable from the circumstances discussed in *Miller*.  In order to conduct an adequate safety inspection, a safety inspector necessarily must be familiar with laws applicable to the

(continued...)

19

been given to "the likelihood of injury, the magnitude of the burden of guarding against it, and the consequences of placing that burden on the defendant." *Eastern Steel*, 209 W. Va. at 397, 549 S.E.2d at 271 (quotations and citations omitted). We conclude that these factors weigh in favor of finding that a safety inspector owes a duty of care to the employees whose safety the inspection is intended to secure. That is to say that it is foreseeable that harm is likely to come to such employees if a safety inspection is negligently performed. The burden upon the inspector is merely to perform his or her duties with "the ordinary skill, care, and diligence commensurate with that rendered by members of his or her profession." Syl. pt. 9, in part, *Eastern Steel*, 209 W. Va. 392, 549 S.E.2d 266. For these reasons, we now hold that a private inspector who inspects a work premises for the purpose of furthering the safety of employees who work on said premises owes a duty of care to those employees to conduct inspections with ordinary skill, care, and diligence commensurate with that rendered by members of his or her profession.

Applying this holding to the question herein certified, *i.e.*, "whether a private party conducting inspections of a mine and mine operator for compliance with mine safety regulations is liable for the wrongful death of a miner resulting from the private party's

---

[4](...continued)
industry being inspected and be able to identify and report violations of the same. It follows, therefore, that such an inspector certainly would be able to foresee the harm that likely would result if unlawful conditions are not reasonably identified and appropriate action taken to remedy the same.

negligent inspection," leads us to answer the question in the affirmative.

## IV.

## CONCLUSION

For the reasons set out in the body of this Opinion, we answer the question certified to this Court by the United States Court of Appeals for the Fourth Circuit in the affirmative and conclude that a private party conducting inspections of a mine and mine operator for compliance with mine safety regulations is liable for the wrongful death of a miner resulting from the private party's negligent inspection.

Certified Question Answered.