**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

**No. 22-2227**

———————————

ELAINE NEIDIG, individually and on behalf of all others similarly situated,

Plaintiff – Appellant,

v.

VALLEY HEALTH SYSTEM,

Defendant – Appellee.

------------------------------

WEST VIRGINIA UNITED HEALTH SYSTEM, INC.; WEST VIRGINIA HOSPITAL
ASSOCIATION; MOUNTAIN HEALTH NETWORK, INC.; CHARLESTON AREA
MEDICAL CENTER, INC.,

Amici Supporting Appellee.

———————————

Appeal from the United States District Court for the Northern District of West Virginia, at
Martinsburg.  Gina M. Groh, District Judge.  (3:22–cv–00161–GMG)

———————————

Argued:  December 7, 2023                    Decided:  January 9, 2024

———————————

Before GREGORY, WYNN, and RUSHING, Circuit Judges.

———————————

Question certified to the Supreme Court of Appeals of West Virginia by published order.
Judge Wynn directed entry of the order with the concurrences of Judge Gregory and Judge
Rushing.

———————————

**ARGUED:** Anthony J. Majestro, POWELL & MAJESTRO, PLLC, Charleston, West Virginia, for Appellant. Jonathan Tyler Mayhew, BOWLES RICE LLP, Martinsburg, West Virginia, for Appellee. **ON BRIEF:** Stephen G. Skinner, SKINNER LAW FIRM, Charles Town, West Virginia; Christina Smith, POWELL & MAJESTRO, PLLC, Charleston, West Virginia, for Appellant. Charles F. Printz, Jr., Liana L. Stinson, BOWLES RICE LLP, Martinsburg, West Virginia, for Appellee. Robert M. Sellards, John H. Zickefoose, Bradley D. Dunkle, BAILES CRAIG & SELLARDS PLLC, Huntington, West Virginia, for Amici West Virginia Hospital Association; Mountain Health Network, Inc.; and Charleston Area Medical Center. Christine S. Vaglienti, Assistant Vice President and Senior Litigation Counsel, WEST VIRGINIA UNITED HEALTH SYSTEM, INC., Morgantown, West Virginia, for Amicus West Virginia United Health System, Inc.

---

ORDER

---

WYNN, Circuit Judge:

This Court, availing itself of the privilege afforded by the State of West Virginia through the Uniform Certification of Questions of Law Act, W. Va. Code §§ 51-1A-1 to -13, hereby requests that the Supreme Court of Appeals of West Virginia exercise its discretion to resolve a certified question of law. Pursuant to W. Va. Code § 51-1A-6(a)(1), we identify the "question of law to be answered" as:

> Whether a plaintiff's claims can fall under the West Virginia Medical
>
> Professional Liability Act if the plaintiff disclaims any form of physical or
>
> emotional injury.

We acknowledge that the Supreme Court of Appeals of West Virginia "may reformulate the question." W. Va. Code § 51-1A-6(a)(3); *accord id.* § 51-1A-4.

It is "appropriate" for this Court to certify "a question of state law to that state's highest court . . . when [we are] required to address a novel issue of local law which is

2

determinative in the case before [us]." *Grattan v. Bd. of Sch. Comm'rs of Balt. City*, 805 F.2d 1160, 1164 (4th Cir. 1986). In our view, "there is no controlling appellate decision, constitutional provision[,] or statute" of the State of West Virginia, W. Va. Code § 51-1A-3, that "definitively answers the certified question," *Shears v. Ethicon, Inc.*, 64 F.4th 556, 558 (4th Cir. 2023). Moreover, the answer thereto will be "determinative of an issue" in this "pending cause." W. Va. Code § 51-1A-3. Accordingly, we exercise our discretion to sua sponte certify a question of state law. *See Shears*, 64 F.4th at 563.

## I.

Under West Virginia law, a certification order "must contain . . . [t]he facts relevant to the question, showing fully the nature of the controversy out of which the question arose." W. Va. Code § 51-1A-6(a)(2); *see Valentine v. Sugar Rock, Inc.*, 766 S.E.2d 785, 791 (W. Va. 2014). "In complying with this requirement, we note that the district court's dismissal was for" failure to state a claim on which relief could be granted under Federal Rule of Civil Procedure 12(b)(6). *Bragg v. United States*, 488 F. App'x 672, 674 (4th Cir. 2012) (per curiam) (unpublished but orally argued) (discussing 12(b)(1) dismissal), *certified question answered*, 741 S.E.2d 90 (W. Va. 2013). Accordingly, "we recount the facts as alleged in the complaint," and "also may consider documents attached as exhibits to the complaint, . . . so long as those documents were integral to the complaint and are authentic." *Mason v. Mach. Zone, Inc.*, 851 F.3d 315, 317 n.2 (4th Cir. 2017).

Defendant Valley Health System ("Valley Health") is a health care provider in West Virginia and other states. It operates six hospitals, including Winchester Medical Center. Valley Health's website states its "vision" as being to provide "quality health care"

3

and advertises "state-of-the-art technology and knowledgeable staff" at its "imaging centers and outpatient diagnostic centers," including for mammograms. J.A. 6–7.[1]

Plaintiff Elaine Neidig went to Winchester Medical Center for three mammograms between March 2016 and June 2019, including one each in December 2017 and June 2019. During this time, Winchester Medical Center "represented itself as an accredited mammography center under the Mammography Quality Standards Act" that was "able to perform proper and correct mammography examinations." J.A. 8. Neidig "chose to go from West Virginia to Winchester Medical [Center]" in Virginia "based on the marketing and advertising of Valley Health into West Virginia," and she "would not have had Winchester Medical Center perform her mammograms" but for the above representations. J.A. 8–9.

In July 2019, however, "federal accreditation inspectors found that Winchester Medical Center staff were not accurately positioning or compressing women's breasts during mammograms," resulting in the Food and Drug Administration declaring that some mammograms performed by Winchester Medical Center had "serious image quality deficiencies" that posed a "serious risk to human health." J.A. 9. Accordingly, the Food and Drug Administration required Valley Health "to perform a Patient and Referring Healthcare Provider Notification . . . to alert all at-risk patients and their providers of the mammography quality problems at the facility." J.A. 18.

Valley Health provided the required notification to Neidig via a letter dated December 16, 2019. The letter stated that "there is a serious concern about the quality of

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

4

the mammography that [Winchester Medical Center] performed between June 20, 2017 and August 31, 2019," and noted that the Food and Drug Administration "determined that [Winchester Medical Center] failed to meet the clinical image quality standards established by [the] facility's accreditation body." J.A. 19. The letter clarified that "[t]his does not necessarily mean that the results [Neidig] and [her] health care provider(s) were given are wrong," but noted that "patients may need to have their mammograms . . . reviewed to determine whether a repeat mammogram at another facility is needed." *Id.* Valley Health offered to "pay for the reevaluation of [Neidig's] mammogram(s) and for [her] repeat mammogram, if needed, at another [Mammography Quality Standards Act]-certified facility within [its] health network or partner facility." J.A. 20. But it did not refund the $1,071 that Neidig paid for the two mammograms she received during the relevant period.

Neidig brought a putative class-action suit against Valley Health in West Virginia state court in August 2022, and Valley Health removed the case to federal court in accordance with the Class Action Fairness Act. Neidig brought three claims: unfair and deceptive acts and practices under the West Virginia Consumer Credit and Protection Act; unjust enrichment; and breach of contract. She did not allege—and has explicitly disclaimed—any physical harm resulting from the low-quality mammograms. Nor did she allege any other form of personal injury, such as negligent infliction of emotional distress.

Valley Health moved to dismiss, in relevant part, on the basis that the complaint failed to state a claim upon which relief could be granted because it was filed beyond the two-year statute of limitations provided by West Virginia's Medical Professional Liability

Act. There is no dispute that if the Medical Professional Liability Act applies, Neidig's claims are untimely. But Neidig argues that the Act does not apply.

The district court agreed with Valley Health that the Medical Professional Liability Act applied to Neidig's claims and, therefore, her complaint was filed after the applicable limitations period had run. Neidig timely appealed.

## II.

The question before us is whether Neidig's claims—although styled as consumer-protection claims for unfair and deceptive acts and practices, unjust enrichment, and breach of contract—nevertheless fall within the ambit of the West Virginia Medical Professional Liability Act. We conclude that the answer to that question is unclear.

The Supreme Court of Appeals of West Virginia has held that courts are required "to look beyond the labels of causes of action and artful pleading and instead critically examine the allegations pled to determine whether the plaintiff's complained-of conduct falls under the [Medical Professional Liability Act]'s provisions." *State ex rel. Charleston Area Med. Ctr., Inc. v. Thompson*, 888 S.E.2d 852, 860 (W. Va. 2023) (quoting *Damron v. Primecare Med. of W. Va., Inc.*, No. 20-0862, 2022 WL 2078178, at *3 (W. Va. June 9, 2022) (memorandum decision)); *accord State ex rel. W. Va. Univ. Hosps., Inc. v. Scott*, 866 S.E.2d 350, 359 (W. Va. 2021) (holding that plaintiffs "cannot avoid the [Medical Professional Liability Act] with creative pleading").

The Medical Professional Liability Act "applies only when two conditions are satisfied, that is, when a plaintiff (1) sues a 'health care provider' or 'health care facility' for (2) 'medical professional liability' as those terms are defined under the Act." *State ex*

6

*rel. W. Va. Div. of Corr. & Rehab. v. Ferguson*, 889 S.E.2d 44, 53 (W. Va. 2023). When those conditions are present, the action must be brought under the Medical Professional Liability Act, even if another cause of action would otherwise apply. *E.g.*, *Minnich v. MedExpress Urgent Care, Inc.-W. Va.*, 796 S.E.2d 642, 646 (W. Va. 2017).

There is no dispute that Valley Health is a health care provider, so only the second prong is at issue here—that is, whether Neidig has sued Valley Health for medical professional liability.

The Medical Professional Liability Act defines "[m]edical professional liability" as

> any liability for damages resulting from the death or injury of a person for any tort or breach of contract based on health care services rendered, or which should have been rendered, by a health care provider or health care facility to a patient. It also means other claims that may be contemporaneous to or related to the alleged tort or breach of contract or otherwise provided, all in the context of rendering health care services.

W. Va. Code § 55-7B-2(i). Neidig does not dispute that a mammogram is a "health care service" for purposes of the Act. *Cf.* J.A. 9–10 (complaint referring to mammograms as health care). But she alleges that the harm she is seeking to remedy is purely as a consumer, rather than as a "patient." She also explicitly disclaims any physical injury arising from her mammograms.[2]

---

[2] The parties dispute how Neidig could prove her claims based on the quality of the mammograms she received. Valley Health asserts that those claims require medical expert testimony as to the standard of care. *Cf.* W. Va. Code § 55-7B-7(a) ("The applicable standard of care and a defendant's failure to meet the standard of care, if at issue, shall be established in medical professional liability cases by the plaintiff by testimony of one or more knowledgeable, competent expert witnesses if required by the court."). At oral argument, Neidig's counsel represented that she could prove her claims without medical expert testimony because Valley Health was required to send a Patient and Referring

This case thus presents an opportunity to flesh out the boundaries of the Medical Professional Liability Act. The Act's legislative history makes clear "the Legislature's intent for the [Medical Professional Liability Act] to broadly apply to services encompassing patient care—not just the care itself." *Scott*, 866 S.E.2d at 359; *see Ferguson*, 889 S.E.2d at 53 (noting that in West Virginia, "in interpreting a statute it is the duty of the court to look to the purpose of the enactment as well as to the language employed" (quoting *Metro. Life Ins. Co. v. Hill*, 177 S.E. 188, 188 Syl. Pt. 2 (W. Va. 1934))). This is because the Act is intended to strike a "balance" between "fairly compensat[ing] patients who have been injured as a result of negligent and incompetent acts by health care providers" and protecting providers from high liability-coverage costs. W. Va. Code § 55-7B-1; *see Ferguson*, 889 S.E.2d at 53 ("The Legislature passed the

---

Healthcare Provider Notification, which, in Neidig's view, conclusively shows that Valley Health misrepresented the quality of the healthcare it offered. Regardless, this dispute would not appear to be dispositive.

In *State ex rel. Charleston Area Medical Center, Inc. v. Thompson*, the Supreme Court of Appeals of West Virginia concluded that the Medical Professional Liability Act applied over the dissents of Justices Hutchison and Wooton, each of whom emphasized that no expert testimony was required in the circumstances of that case. *See Thompson*, 888 S.E.2d at 863 (Hutchison, J., dissenting) (noting that the defendant medical center's "alleged misconduct—having absolutely nothing to do with the provision of health care—is within the experience and judgment of the average juror"); *id.* (Wooton, J., dissenting) ("Whether [the medical center] was negligent . . . is a matter that requires no expert testimony. It requires only the judgment of a lay person, using his or her ordinary understanding of the concept of 'reasonable care.'"); *cf.* W. Va. Code § 55-7B-6(b) to (c) (requiring plaintiff bringing claim under the Act to serve on each defendant a "screening certificate of merit" including an "expert's opinion as to how the breach of the applicable standard of care resulted in injury or death," *unless* "the cause of action is based upon a well-established legal theory of liability which does not require expert testimony supporting a breach of the applicable standard of care").

8

[Medical Professional Liability Act] in an effort to remedy what it perceived as a crisis in mounting lawsuits against professional health care providers and health care facilities that led to difficulty in procuring reasonable liability insurance for the medical community.").

At the same time, "[w]hile the reach of the [Medical Professional Liability Act] may indeed be broad, it is not limitless." *Trivett v. Summers Cnty. Comm'n*, __ S.E.2d __, No. 22-0202, 2023 WL 7391488, at *11 n.14 (W. Va. Nov. 8, 2023) (quoting *Thompson*, 888 S.E.2d at 866 (Wooton, J., dissenting)). In fact, the Supreme Court of Appeals has also emphasized that the Act "is in derogation of the common law and as such, its provisions must be given narrow construction." *State ex rel. Morgantown Operating Co. v. Gaujot*, 859 S.E.2d 358, 370 (W. Va. 2021).

Two decisions of the Supreme Court of Appeals of West Virginia are particularly relevant for evaluating whether Neidig's claims are for "medical professional liability" under the Act: *State ex rel. West Virginia University Hospitals, Inc. v. Scott* and *State ex rel. Charleston Area Medical Center, Inc. v. Thompson*. However, neither decision definitively resolves the certified question because neither explicitly addresses whether the Act applies in the absence of any personal injury.

*Scott* established that the statutory definition of "medical professional liability" encompasses two types of claims: "anchor claim[s]" and "ancillary claims." *Scott*, 866 S.E.2d at 360. According to *Scott*, anchor claims are health care-related claims. *Id.* Ancillary claims are those "that are 'contemporaneous to or related to' [the health care] claim, but still must be in the overall context of rendering health care services." *Id.* (quoting W. Va. Code § 55-7B-2(i)). A plaintiff can have more than one anchor claim. *E.g.*, *id.* at

9

354, 361 (noting multiple anchor claims, including medical negligence and failure to document). And an anchor claim is required before an ancillary claim can fall under the Medical Professional Liability Act. *Id.* at 360 ("[Y]ou must have the anchor claim (fitting the definition of 'health care') and then make the showing that the ancillary claims are (1) contemporaneous with or related to that anchor claim; and (2) despite being ancillary, are still in the context of rendering health care.").

*Scott* emphasized, however, that anchor "health care" claims were not limited to those directly alleging medically tortious actions (such as medical negligence), but could also include a wide variety of actions, including corporate negligence. In *Scott*, a couple sued a hospital after a nurse introduced air bubbles into their newborn's bloodstream via intravenous equipment, leading to an air embolism that caused the infant serious neurological impairment. *Id.* at 355, 359. The couple brought claims not only for medical negligence, but also for corporate negligence. Their corporate-negligence claims were for 1) the decision not to purchase and utilize air filters for the intravenous system; 2) the failure to document the cause of the child's injuries correctly in the discharge summary; 3) spoliation of evidence, specifically, the peripheral line tubing used in the intravenous system; and 4) the failure to report the incident properly to regulators. *Id.* at 355; *see id.* at 359–61. The Supreme Court of Appeals concluded that the Medical Professional Liability Act applied to all four corporate-negligence claims, with the first two qualifying as anchor claims and the latter two as ancillary claims.[3] *Id.* at 361.

---

[3] Unlike for the other three corporate-negligence claims, *Scott* does not explicitly

10

In concluding that the failure-to-purchase and failure-to-document claims qualified as anchor claims themselves—even though those claims did not directly allege traditional medical-malpractice torts—*Scott* emphasized that those claims nonetheless implicated "medical judgment or skill" and were thus "'health care' claim[s]." *Id.* at 359–60; *see id.* at 361. The Court explained that although corporate-level decisionmakers were behind the failure to purchase the air filters, they made that choice "in contemplation that the machine[s] either needed [the air filters] or did not *to properly function in rendering care to patients*." *Id.* at 361 (emphasis added). The Court further noted that the claim's adjudication would require expert testimony to establish that the failure to use an air filter fell below "the standard of care, and caused the injury." *Id.* Therefore, the Court concluded that the failure-to-purchase claim "inherently [arose] in 'the context of rendering health care.'" *Id.* (quoting W. Va. Code § 55-7B-2(i)).

---

state whether the decision not to purchase and utilize air filters for the intravenous system constitutes an anchor or ancillary claim. For several reasons, we understand *Scott* to have treated that claim as an anchor claim. First, *Scott* analyzes the ancillary claims together, while analyzing the failure-to-purchase and failure-to-document claims individually. *Scott*, 866 S.E.2d at 361. Second, the discussion of the failure-to-document claim, which follows the failure-to-purchase claim, refers back to the failure-to-purchase analysis in concluding that the failure-to-document claim is an anchor claim. *Id.* Third, the failure-to-purchase claim appears to be even more obviously an anchor health care claim than the failure-to-document claim is, given that the air filters in question "would have allegedly prevented the air embolism that resulted in injuries to the minor child," and thus bear a greater causal relationship to the injuries than do the post-injury failure-to-document allegations. *Id.*; *accord id.* at 366, 370 (Wooton, J., concurring in part and dissenting in part) (agreeing that the failure-to-purchase claim, but not the other corporate-negligence claims, fell under the Medical Professional Liability Act). Accordingly, we assume herein that the failure-to-purchase claim was an anchor claim.

11

*Scott* reached the same conclusion for the failure-to-document claim, which was based on the provider's incorrect documentation of the infant's injuries in the discharge summary. The Court explained that while "documentation may not appear to be 'health care' in a traditional sense of the word," documentation in a patient's medical record involves medical judgment or skill. *Id.* ("Deciding what to document—or what not to document—in a patient's medical record is a decision solely in the purview of [the] physician, nurse, or other medical professional providing care[.]"). Additionally, "[l]ike the [claim related to the] purchase of air filters, [the failure-to-document] claim implicate[d] a medical professional inquiry" because "the cause of the [infant's] cardiac arrest and subsequent injuries" would need to "be proven to prevail on th[at] claim." *Id.* Accordingly, the claim "implicate[d] the provision of 'health care' under the" Medical Professional Liability Act, meaning that it was "not an ancillary claim, but an anchor 'health care' claim in and of itself." *Id.*

By contrast, *Scott* concluded that the spoliation-of-evidence and failure-to-report claims were "ancillary" because while they did not themselves implicate health care decisions, they were claims "contemporaneous to or related to" the anchor claims that arose "in the context of rendering health care." *Id.* at 363 (quoting *Boggs v. Camden-Clark Mem'l Hosp. Corp.*, 609 S.E.2d 917, 924 (W. Va. 2004)); *see id.* at 361–62. They consequently also fell under the Medical Professional Liability Act.

*Thompson* provides further guidance regarding the anchor-claim test. There, the plaintiff suffered a stillbirth arising from natural causes. *Thompson*, 888 S.E.2d at 855. This left the defendant medical center in possession of the fetal remains, which it released

12

to a funeral home by giving the remains to the funeral home's employee to transport in her personal vehicle. *Id.* at 855–56. The plaintiff sued the medical center, funeral home, and funeral home's employee, asserting against the medical center "claims of negligence, negligent infliction of emotional distress, negligent mishandling of a corpse, and negligent supervision." *Id.* at 860; *see id.* at 856.

The two questions before the Supreme Court of Appeals were whether the plaintiff's claim involved a "patient" under the Medical Professional Liability Act—since the claims all arose after the fetus's death—and if so, whether the medical center's "handling of the fetal remains constitute[d] 'health care' within the meaning of the [Act]." *Id.* at 857–58. The plaintiff argued that the Act did not apply because a deceased individual is not a "patient" under the Act. *Id.* at 858. But the Supreme Court of Appeals concluded that the Act applied because the claims "all ar[o]se in the context of the alleged mishandling of the fetal remains as health care services" provided to *the plaintiff* as a patient in her own right during her hospitalization related to the stillbirth. *Id.* at 860; *see id.* at 858–59.

In so holding, *Thompson* reasoned that the defendant medical center "obtained the fetal remains . . . . as a direct result of providing health care" to the plaintiff, and so the claims arising out of the mishandling of those remains were based on health care services. *Id.* at 859. Therefore, it described the "anchor claim" as the "handling of fetal remains as a result of a stillbirth delivery," meaning at minimum the cause of action for negligent mishandling of a corpse qualified as an anchor claim. *Id.* at 861. *Thompson* also concluded that, to the extent the plaintiff had asserted a separate violation-of-privacy cause of action, such a claim constituted an ancillary claim that fell under the Medical Professional Liability

13

Act. *Id.* at 860–61 (concluding that the Act "applies to any [claim based on the] alleged unauthorized disclosure of medical information" because such a claim "would be contemporaneous and related to the anchor claim—handling of fetal remains as a result of a stillbirth delivery").

Scott and *Thompson* could be read to require Neidig's claims to be brought under the Medical Professional Liability Act, and indeed, Valley Health urges just that result. After all, Neidig's claims ultimately rest in some way on the quality of health care Valley Health provided, even if she disclaims any medical injury. *Cf. Minnich*, 796 S.E.2d at 647 ("The critical inquiry is whether the subject conduct that forms the basis of the lawsuit is conduct related to the provision of medical care.").

But Neidig seeks to distinguish *Scott* and *Thompson* because both involved some form of underlying personal injury—the physical injury to the infant in *Scott*, and the emotional distress experienced by the plaintiff in *Thompson*—which, she argues, is required by the Act's statutory reference to the "death or *injury of a person* . . . based on health care services rendered." W. Va. Code § 55-7B-2(i) (emphasis added). In contrast, Neidig disclaims any personal injury and only asserts legal and economic injuries.

However, because *Scott* and *Thompson* focused on the meaning of other statutory terms not at issue here when evaluating anchor claims, they did not address how we should understand "injury of a person." Nor did they clearly delineate which portion of the Act's definition of "medical professional liability" refers to anchor claims. And because we have located no West Virginia case evaluating the Medical Professional Liability Act's

14

application in the absence of any personal injury, we think there remains an open question as to how the statute applies in this case. *Shears*, 64 F.4th at 558.

Recall that the Medical Professional Liability Act defines "[m]edical professional liability" as

> any liability for damages resulting from the death or injury of a person for any tort or breach of contract based on health care services rendered, or which should have been rendered, by a health care provider or health care facility to a patient. It also means other claims that may be contemporaneous to or related to the alleged tort or breach of contract or otherwise provided, all in the context of rendering health care services.

W. Va. Code § 55-7B-2(i). *Scott* explains that the Act's reference to "other claims that may be contemporaneous to or related to the alleged tort or breach of contract . . . , all in the context of rendering health care services," *id.*, encompasses "ancillary claims," *Scott*, 866 S.E.2d at 360. But that leaves two segments of the definition of "medical professional liability" unaccounted for: first, "any liability for damages resulting from the death or injury of a person for any tort or breach of contract based on health care services rendered, or which should have been rendered, by a health care provider or health care facility to a patient"; and second, "other claims that may be . . . otherwise provided, all in the context of rendering health care services." W. Va. Code § 55-7B-2(i).

*Thompson* appears to analyze its anchor claims arising from the mishandling of the fetal remains under the first of these statutory segments. *See Thompson*, 888 S.E.2d at 860 (concluding the Medical Professional Liability Act applies because the complaint alleges claims regarding "health care services rendered, or which should have been rendered, by a health care provider or health care facility to a patient" (quoting W. Va. Code § 55-7B-

15

2(i))). But *Scott* arguably finds one anchor claim to fall under the second segment. *See Scott*, 866 S.E.2d at 361 (seeming to conclude that the failure-to-purchase claim is an anchor claim because it "is a claim that inherently arises in 'the context of rendering health care'"). And *Scott* could be interpreted to mean that an anchor claim need not be tied to a personal injury; while *Scott*'s failure-to-document anchor claim did pertain to a physical injury in that case, it postdated the injury and thus did not cause it. In any event, neither *Scott* nor *Thompson* explicitly holds that anchor claims *must* fall under the first of these statutory segments, nor does either explain how we should understand "injury of a person."

If anchor claims are required to fall under the first sentence of the statutory definition of "medical professional liability"—as Neidig asserts—then the meaning of "injury of a person" becomes central. The Medical Professional Liability Act defines "[i]njury" as "injury or death to a patient arising or resulting from the rendering of or failure to render health care." W. Va. Code § 55-7B-2(h). This definition, in the medical context, most naturally points to a physical injury, particularly because § 55-7B-2(h) provides a single definition defining "Injury" and "*Medical injury*" together. *Id.* (emphasis added). The definition of "[m]edical professional liability" at issue here similarly places "injury" alongside "death," again most naturally encompassing physical injury arising from medical malpractice. *Id.* § 55-7B-2(i).

On the other hand, the West Virginia legislature has used the term "personal injury" in other statutes, *e.g.*, W. Va. Code § 55-7-25, so the lack of such a reference here may be telling. Further, the statute's reference to "liability for damages resulting from the . . . injury of a person for any . . . *breach of contract* based on health care services

16

rendered" might most naturally be read to refer to legal injuries, even if we could imagine situations where a breach of contract could lead to a physical injury, particularly in the medical context. W. Va. Code § 55-7B-2(i) (emphasis added). Additionally, as noted, *Thompson* appears to conclude that the negligent mishandling of fetal remains allegedly caused an "injury of a person," even though the only asserted injury to the plaintiff was emotional, rather than physical, harm. Yet the Supreme Court of Appeals could conceivably have concluded that an emotional injury fell within the definition of "injury of a person" without implying that a purely legal or economic injury would.

Putting aside the "injury" language, the second segment of the definition of "[m]edical professional liability" arguably creates a wide opening for anchor claims to be defined as "other claims that may be . . . otherwise provided, all in the context of rendering health care services." *Id.* Yet we have found no West Virginia case law explicitly pointing to that language. And if an anchor claim can fall under that sentence, the language used tells us little about the boundaries of what can constitute an anchor claim. A claim for an erroneously high copay charge, for example, would facially seem to qualify as one that is "otherwise provided . . . in the context of rendering health care services," yet such a claim might not constitute an anchor claim under *Scott* because it does not implicate a medical judgment.

It is therefore unclear to us from the statutory language, as well as from *Scott* and *Thompson*, whether a plaintiff who is asserting no personal injury—physical or emotional—may nevertheless be required to abide by the Medical Professional Liability Act in certain circumstances. As a result, "there is no controlling appellate decision . . . or

17

statute . . . that definitively answers the certified question." *Shears*, 64 F.4th at 558. Moreover, the answer thereto is "determinative" of the proper statute under which Neidig's claims arise and the corresponding limitations period. W. Va. Code § 51-1A-3. Accordingly, certification is appropriate.

III.

In light of the foregoing, we request that the Supreme Court of Appeals of West Virginia exercise its discretion to resolve the certified question of law discussed herein. Pursuant to W. Va. Code § 51-1A-6(a)(4), we note that all of the parties in this matter are represented by counsel, whose names and addresses are as follows:

*Counsel for the Plaintiff, Elaine Neidig:*

Anthony J. Majestro, Esquire
Christina L. Smith, Esquire
POWELL & MAJESTRO, PLLC
Suite P−1200
405 Capitol Street
P.O. Box 3081
Charleston, WV 25331

Stephen Gibson Skinner, Esquire
SKINNER LAW FIRM
P.O. Box 487
Charles Town, WV 25414

*Counsel for the Defendant, Valley Health System:*

Jonathan Tyler Mayhew, Esquire
Charles Francis Printz, Jr., Esquire
Liana Stinson, Esquire
BOWLES RICE, LLP
101 South Queen Street
P.O. Drawer 1419
Martinsburg, WV 25402

18

*Counsel for Amicus, West Virginia United Health System, Inc.:*

Christine Sayre Vaglienti, Esquire
WEST VIRGINIA UNIVERSITY HOSPITALS, INC.
1238 Suncrest Towne Centre Drive
Morgantown, WV 26505

*Counsel for Amici, West Virginia Hospital Association, Mountain Health Network, Inc., and Charleston Area Medical Center, Inc.:*

Bradley David Dunkle, Esquire
Robert Sellards, Esquire
John Howard Zickefoose, Esquire
BAILES CRAIG & SELLARDS PLLC
401 10th Street
Huntington, WV 25701

Accordingly, pursuant to the privilege made available to this Court by the West Virginia Uniform Certification of Questions of Law Act, it is hereby ORDERED:

(1) That the question set forth herein be certified to the Supreme Court of Appeals of West Virginia for resolution;

(2) That the Clerk of this Court transmit to the Supreme Court of Appeals of West Virginia, under the official seal of this Court, a copy of this Order of Certification; and

(3) That the Clerk of this Court provide the original or copies of all or such portion of the record before this Court as may be requested by the Supreme Court of Appeals of West Virginia, with any and all such requests being effective upon notification by ordinary means from the Clerk of the Supreme Court of Appeals.

*Shears*, 64 F.4th at 569; *see* W. Va. Code § 51-1A-5.

19

This Order of Certification is entered by Judge Wynn, with the concurrences of Judge Gregory and Judge Rushing.

*QUESTION CERTIFIED*

FOR THE COURT:



_____
James Andrew Wynn
United States Circuit Judge

A True Copy NWAMAKA ANOWI

Clerk of the United States Court of Appeals for the Fourth Circuit

Nwamaka Anowi

20